2022 IL App (2d) 200787-U
No. 2-20-0787
Order filed May 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-15 |
| MARCUS McGILL, | ) ) ) | Honorable Philip Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's failure to provide a limiting instruction on the parties' stipulation to defendant's predicate felonies for his armed habitual criminal charge was not error, much less plain error. The court's instruction on the stipulation accurately stated the law, and it was defendant's responsibility to request a limiting instruction clarifying that the State could not use predicate felonies as evidence of defendant's propensity to commit the other charged offenses. Finally, counsel was not ineffective for failing to request that limiting instruction, as defendant could show no prejudice given the weight of the evidence against him on the sole disputed factual issue relevant on appeal: whether he possessed a firearm.

¶ 2    After a jury trial, defendant, Marcus McGill, was convicted of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2016)), based on his possession of a firearm while

having two prior felony convictions. The court sentenced him to eight years' imprisonment. Before trial, the parties stipulated to both convictions as an element of the offense. The trial court allowed the State to use one of the convictions as impeachment. On appeal, defendant contends that (1) the court committed plain error in its oral instruction to the jury on the stipulation; and (2) alternatively, his counsel was ineffective for failing to request a limiting instruction on the use of the prior offenses. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The State charged defendant with (1) armed violence (720 ILCS 5/33A-2 (West 2016)) in that he was armed with a semiautomatic pistol while he knowingly resisted arrest (720 ILCS 5/31-1(a-7) (West 2016)); (2) AHC in that he possessed the pistol and had been convicted of aggravated robbery in Kane County case No. 04-CF-1718 and unlawful use of a weapon by a felon in Kane County case No. 08-CF-196; (3) unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)); (4) and (5) two counts of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)); and (6) resisting a peace officer (720 ILCS 5/31-1(a-7) (West 2016)). The two counts of aggravated unlawful use of a weapon were dismissed before trial.

¶ 5     Before trial, the parties agreed to stipulate that defendant had prior convictions of aggravated robbery in 2004 and unlawful use of a weapon by a felon in 2008. These were the predicate felonies for the charge of AHC. Defendant elected to have the jury told that he had been convicted of two felonies but not told the specific offenses. The trial court allowed the State to impeach defendant with only the aggravated-robbery conviction.

¶ 6     At trial, Doug Brouwer, a De Kalb County sheriff's deputy, testified on direct examination as follows. On January 8, 2017, he was on patrol duty on Lincoln Highway (Route 38), in full uniform and driving a marked squad car. As Brouwer went east, he saw a vehicle exit a bar's

parking lot at a fast pace. Brouwer learned that the vehicle had an expired registration, and he stopped it on Annie Glidden Road, just north of Route 38 and next to University Village, a large apartment complex.

¶ 7     Brouwer testified that he approached the vehicle. There were two occupants: Maurice Pool in the driver's seat and defendant in the front passenger seat. Pool handed Brouwer his driver's license. Brouwer smelled the odor of fresh cannabis and spoke to Pool about it. He saw that defendant was sitting very still, with his hands in his lap and his fists clenched on his upper thigh. Defendant, with his jaw clenched, turned to look at Brouwer. Brouwer asked defendant for identification; defendant said that he had none. Before Brouwer could ask defendant his name, defendant exited the vehicle and began "sprinting" into University Village.

¶ 8     Brouwer testified that he started chasing defendant and repeatedly shouted at him to stop. As defendant ran, his left arm swung rapidly alongside his body, consistent with running fast. However, his right hand and arm remained pulled in tightly to his side. Defendant fell. He used both hands to pick himself up and continued running. Again, his left arm was swinging, but his right arm remained still at his side.

¶ 9     Brouwer testified that he pulled out his Taser, as he feared losing sight of defendant and then running into him. Defendant fell a second time. Brouwer fell soon after, landing with his head near defendant's feet. Defendant tried to get up and resume running. This time, he raised himself using his left hand, which was on the ground, but his right arm was pulled in close to his hip with his right hand on his hip. Defendant turned and looked at Brouwer, keeping his right hand on his hip. Brouwer deployed his Taser. Both probes connected with defendant, who fell onto his stomach. He moved his right hand around his hip and underneath the right side of his body and used his left hand to try removing the Taser probes.

¶ 10    Brouwer testified that he ordered defendant to put his hands out to his sides and stop trying to get up. Defendant did not obey. His right hand was not visible, and he was still trying to get off the ground. Brouwer deployed the Taser to reactivate the probes already embedded. Defendant again put his right hand under his body and used his left hand to try to remove the probes. Concerned that he might get up and run, Brouwer repeated his order. Defendant disobeyed and Brouwer deployed the Taser a third time. Finally, defendant put his hands out to his sides and remained lying on his stomach.

¶ 11    Brouwer testified that, at that point, Allison Remnes, a City of De Kalb police officer, arrived. As defendant lay on the ground, Brouwer asked him why he was running from him. Defendant did not answer. Brouwer asked him his name. Defendant said "Maurice," but Brouwer told him he was lying. Defendant then identified himself as "Marcus."

¶ 12    Brouwer testified that, after a few minutes, he and Remnes stood defendant up. Brouwer then saw a chrome-plated semiautomatic pistol lying directly underneath where defendant had lain. Brouwer commented on this discovery; in response, defendant repeatedly said, " 'No.' " Brouwer patted down defendant. In defendant's left pocket were a bag of cannabis and an identification card. Tucked into his right-side waistband was a plastic holster. After an ambulance took defendant away, Brouwer collected the gun with its loaded magazine.

¶ 13    Brouwer testified that his squad car's camera and shoulder microphone were activated during the stop. The video captured what was visible from only the front of the squad car. The State played the recordings for the jury. The video showed the stop, including defendant's sudden exit from Pool's vehicle. The recording was consistent with Brouwer's testimony.

¶ 14 Brouwer testified that, when he told defendant, " '[Y]ou had a gun, man,' " it was the first time he saw the gun. Defendant said that the gun was not his. Before Brouwer touched or moved the gun, he photographed it. The court admitted the photograph, gun, and bullets into evidence.

¶ 15 Brouwer testified that the holster he found when he patted down defendant was intended for a small weapon—different from model he recovered. However, the holster's front had been cut out to accommodate a larger gun like the one recovered from where defendant had fallen.

¶ 16 Brouwer testified on cross-examination as follows. While defendant was still in Pool's vehicle, Brouwer asked him several questions. Defendant responded clearly. Before defendant started running, Brouwer did not see him reach down for anything or move toward the glove compartment. Defendant's right fist was clenched, and he was not holding anything.

¶ 17 Brouwer testified that, after defendant fell the second time, he attempted to get up, using his right hand. At some time, his knees came up. Brouwer used his Taser on defendant before he could stand up. About 20 seconds later, Remnes arrived. Each officer lifted defendant by one shoulder, stood him up, and handcuffed him. While defendant was still on the ground, the holster was tucked into his waistband. Brouwer did not see the gun until defendant was on his feet. The gun was underneath where defendant had lain, but Brouwer could not exactly recall what part of defendant's body had been in that spot.

¶ 18 Brouwer testified on redirect that, after securing defendant, he looked over the entire path that he had run and saw no gun lying anywhere.

¶ 19 Remnes testified that she helped Brouwer handcuff defendant and stood by while Brouwer got him off the ground. As soon as defendant got up, Remnes saw the silver handgun lying underneath where he had lain. When she first saw defendant, as she approached, he was in front

of her. She did not see him try to move on his own. Asked where the gun was found relative to defendant's body, Remnes testified that it lay where his torso area had been.

¶ 20 Before the State presented the stipulation, the trial court told the jury:

"Okay. The next piece of evidence that the State is going to introduce is a stipulation.

A stipulation is evidence. It is to be considered by you as evidence. It is to be considered by you as if a witness had testified to it, but it's a way that the lawyers can come to agree on certain pieces of evidence in order to speed the trial along, so you are to consider this as evidence."

Defendant did not object to this instruction.

¶ 21 The State then read the following stipulation:

"That, prior to January 8, 2017, the defendant had been convicted of two qualifying offenses. The defendant and the State stipulate that these convictions are sufficient to sustain the second proposition of the charge of [AHC], and the second proposition of unlawful use or possession of a weapon by a felon."[1]

¶ 22 The State rested. During the instructions conference, defendant did not request any limiting instruction concerning the stipulation.

¶ 23 Defendant testified on direct examination as follows. His conviction of aggravated robbery occurred in 2004 when he was eighteen. On January 7, 2017, he got off work, went home, then met with Pool at a mutual friend's house. They smoked some marijuana and left. With Pool

---

[1] The unlawful possession convictions were merged, for sentencing, with the AHC conviction. Defendant raises no issue regarding the unlawful possession convictions.

driving, they stopped briefly at a restaurant to buy more marijuana. Next, they drove to the home of Pool's cousin but were stopped on Annie Gidden Road, short of their destination.

¶ 24 Defendant testified that the stop made him a little nervous because he had marijuana in his pocket. When Brouwer asked him for identification, he had an identification card in the same pocket as the marijuana. However, he did not want to remove the former for fear of exposing the latter. Becoming more nervous, defendant took off running because he did not want to get caught with marijuana. He opened the door with his right hand, started to run, and, after a couple of seconds or less, threw the marijuana into a parking lot.

¶ 25 Defendant testified that, after tossing away the marijuana, he kept running, tripped, fell face-down, and pulled himself up with both hands. He ran some more, then tripped again. As he tried to get up, he felt a sharp pinch in his buttocks and fell to the ground again. He tried to pull out the Taser probes with his right hand. Defendant was right-handed and never used his left hand to pull out the probes. After falling the second time, he made no effort to get up but lay flat on his stomach. Brouwer told him to put his hands out; eventually, he complied. Remnes came along from defendant's right side, kneeled over him, and handcuffed him from the back.

¶ 26 Defendant testified that Brouwer picked him up off the ground and searched him. When Brouwer picked up defendant, he did not say anything about a gun, and he never mentioned a holster. Brouwer found a small bag of marijuana and an identification card in defendant's left pocket, two phones in his right pocket, and nothing in his back pockets. Brouwer then removed the probes from defendant and walked him to the ambulance.

¶ 27 Defendant testified that the gun and holster admitted into evidence were not his. At some point, Brouwer asked him about the gun, and defendant responded that it was not his. Defendant told Brouwer his true first name.

¶ 28    On cross-examination, the prosecutor asked defendant whether the gun was visible when he told Brouwer that it was not his. Defendant answered, "He—we noticed it when we started walking towards the ambulance." Asked where the gun came from, defendant testified, "I have no idea." Also, he did not know from where the holster came.

¶ 29    Defendant testified that, early in the stop, Brouwer told him and Pool that marijuana possession was no longer a criminal matter but only a civil one. However, defendant did not understand "what's the difference between the civil [and] the criminal."

¶ 30    Defendant testified that he ran away because he was afraid that Brouwer would find the marijuana he had bought at the restaurant. He purchased only one bag and threw it away as he started running. Brouwer discovered a bag of marijuana in his left pocket because he had smoked marijuana before going to the restaurant.

¶ 31    The jury found defendant guilty of AHC and unlawful possession of a weapon by a felon and not guilty of armed violence and resisting a peace officer. He did not file a posttrial motion. The trial court merged the unlawful possession count into the AHC count and sentenced defendant to 10 years' imprisonment, which was later reduced to 8 years. Defendant timely appealed.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, defendant makes two related claims of error. First, the trial court committed plain error in its oral instruction to the jury on the parties' stipulation because the instruction allowed the jury to consider the two predicate offenses as evidence of defendant's propensity to commit the offenses for which he was on trial. Second, his counsel was ineffective for failing to request a limiting instruction to avoid this danger.

¶ 34    We turn to the first claim. Defendant notes that the two offenses were admissible to prove an element of AHC. See 720 ILCS 5/24-1.7(a) (West 2016). However, he notes further that, in

general, other-crime evidence is not admissible merely to prove a defendant's propensity to commit crime. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Manning*, 182 Ill. 2d 193, 214 (1998). Relying on *People v. Cavette*, 2018 IL App (4th) 150910, defendant contends that the court abused its discretion by giving the open-ended instruction that the stipulated offenses should be considered as "evidence" without the caution that they must not be considered as evidence of his propensity to commit a charged offense. See *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009) (whether to give particular instruction is reviewed for abuse of discretion).

¶ 35    The State contends first that this was an invited error because defendant acquiesced in the phrasing of the stipulation. We agree with defendant that the error was not invited. The stipulation itself is not the claimed error; the trial court's introduction to the stipulation, which told the jury that the stipulation was "evidence," without limiting that word, is the claimed error. The State contends next that the error is forfeited because defendant neither objected contemporaneously nor raised the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186-88 (1988). Defendant acknowledges the forfeiture but requests that we address his claim under the plain-error rule. See Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013); *People v. Sebby*, 2017 IL 119445, ¶ 48. The plain-error rule applies when a clear or obvious error occurred and either (a) the evidence was closely balanced or (b) the error was so serious that the defendant was denied a substantial right. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant invokes both prejudice prongs. The State contends that no error occurred and that defendant has met neither prong of the prejudice test.

¶ 36    We initially address whether there was a clear or obvious error. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (first step in plain-error analysis is to determine whether any error occurred).

¶ 37    Defendant relies principally on *Cavette*. There, the defendant was charged with AHC and a drug offense. The parties stipulated to the existence of the predicate convictions. Before the stipulation was read, the trial court instructed the jury, " 'you should consider this along with all of the other evidence of the case.' " *Cavette,* 2018 IL App (4th) 150910, ¶ 28. The State conceded that plain error had occurred. *Id.* The court explained that the trial court's introduction to the stipulation "improperly authoriz[ed] the jury to use the evidence of other crimes beyond the limited purpose of satisfying the predicate felony elements of [AHC]." *Id.* ¶ 32.

¶ 38    The court relied partly on *People v. Johnson*, 2013 IL App (2d) 110535, a case with considerably more complicated facts. There, the defendant was tried before a jury on charges of unlawful possession of a weapon by a felon (UPW) (two counts) and misdemeanor domestic battery (one count). The parties had agreed to the joinder of the disparate charges. *Id.* ¶¶ 4-5. The parties stipulated to the defendant's conviction of the predicate offense for UPW. The trial court ruled that the State could introduce evidence of his prior acts of domestic violence against the complaining witness, under a statutory exception to the common-law rule that other-crimes evidence cannot be admitted to prove propensity. *Id.* ¶¶ 7-12. At trial, the State presented the stipulation that the defendant had previously been convicted of the predicate felony for UPW. The court instructed the jury that the stipulated evidence " 'can be used by you like any other evidence in this case to come to your verdict.' " *Id.* ¶ 29. The State also introduced the evidence of the defendant's prior bad acts against the complaining witness. The court instructed the jury that it could consider this evidence relative to " 'intent *** and *propensity*.' " (Emphasis added.) *Id.* ¶ 35. The jury convicted the defendant of all the charges.

¶ 39    On appeal, we held that the defendant's counsel had been ineffective for agreeing to join the charges and that the trial court incorrectly instructed the jury on the predicate felony conviction

and the other-crime evidence. *Id.* ¶ 38. We explained that the trial court's failure to give limiting instructions for evidence proper for consideration on one charge prejudiced the defendant on the other charge. First, the failure to limit the jury's consideration of the predicate offense for UPW created the danger that the jury could consider the offense as probative of the defendant's propensity to commit the domestic battery. *Id.* ¶ 71. Second, the failure to limit the jury's consideration of defendant's prior domestic batteries created the danger that the jury could consider them as proof of his propensity to commit UPW. *Id.* ¶ 75. The instructional error was "plain" because it created "a serious risk that the defendant was incorrectly convicted because the jury did not understand the applicable law, so as to threaten the fundamental fairness of the defendant's trial." *Id.* ¶ 76. The error required reversal because "regardless of the closeness of the evidence *** it denied [the] defendant a fair trial and undermined the integrity of the judicial process." *Id.*

¶ 40    In *Johnson*, we held that, without limiting instructions, the jury might use the evidence admissible only as to one charge as evidence of his guilt of the other charge. Interestingly, we did *not* hold (at least explicitly) that the failure to provide a limiting instruction on the predicate offense for UPW prejudiced the defendant *as to UPW*. This makes the holding in *Cavette* a substantial extension of *Johnson*, not a straightforward application. Nonetheless, in the interest of uniformity, we accept the holding in *Cavette*.

¶ 41    However, we believe that the facts of this case are distinguishable from both *Johnson* and *Cavette*. In those cases, the trial courts' instructions misstated the law to the extent that each court advised the jury that it could consider the other-crimes evidence in the stipulations in the same manner as the other evidence. See *People v. Heard*, 187 Ill. 2d 36, 58 (1999) (other-crimes evidence is not admissible to show the defendant's propensity to commit crime). Here, the trial

court made no such misstatement; it merely stated that the stipulation was evidence and that the jury should consider it evidence. See Illinois Pattern Jury Instructions, Criminal, No. 1.01(9) (revised Apr. 30, 2021). As there was no misstatement of the law, this case pushes us beyond *Cavette* and *Johnson*. Defendant asks us to consider whether the trial court's failure to include, *sua sponte*, a limiting instruction was error.

¶ 42     Fortunately, the case law is clear: it is not the trial court's responsibility to give *sua sponte* a limiting instruction on other-crimes evidence. *People v. Markiewicz*, 246 Ill. App. 3d 31, 44 (1993) ("[A] trial court is not responsible for giving an instruction not offered *sua sponte*."); *People v. Mullen*, 80 Ill. App. 3d 369, 375 (1980) ("[A]lthough an admonitory instruction regarding the purpose for which evidence of other crimes was admitted is advisable, the trial court has no duty *sua sponte* to give such instruction restricting the use of proof of other offenses."); *People v. Fontana*, 251 Ill. App. 3d 694, 701 (1993) ("The trial court is not obligated to give a limiting instruction *sua sponte*, and the defendant's failure to tender such an instruction waives any objection concerning its absence."); *People v. Musitief*, 201 Ill. App. 3d 872, 877-78 (1990) (defendant's failure to tender instruction limiting consideration of other-crimes evidence to issue of motive for arson "cannot be allowed to increase [our] assessment of [the] possible prejudicial effect" of the other-crimes evidence). Accordingly, the trial court did not err in not including a limiting instruction *sua sponte*. Because there was no error in the trial court's instruction, there was no plain error as to that instruction.

¶ 43     We turn to defendant's other claim of error: that his counsel was ineffective for failing to request the trial court to instruct the jury that the prior felonies could not be considered evidence of his propensity to commit AHC.

¶ 44    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was objectively unreasonable; and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *Johnson*, 2013 IL App (2d) 110535, ¶¶ 41, 57. Put another way, "a defendant must show both that counsel's representation was deficient and that the asserted deficiency in counsel's performance prejudiced the defendant." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Additionally, the analysis for an ineffective-assistance claim is similar to plain-error review under the closely-balanced-evidence prong—in either case, the defendant must show prejudice. *People v. White*, 2011 IL 109689, ¶ 133.

¶ 45    Defendant contends first that there was closely balanced evidence on the sole disputed factual issue pertinent here: whether he possessed a firearm. See 720 ILCS 5/24-1.7(a) (West 2016)). He contends that neither Brouwer nor Remnes testified to seeing the semiautomatic gun on him. He does not deny that they recovered it at the scene of his detention, from the ground on which he had been lying before they secured him. Nonetheless, he maintains that this case comes down to a credibility contest because he (1) denied owning the gun or carrying it that night and (2) testified to a similar effect at trial. Defendant maintains that, therefore, the evidence was closely balanced.

¶ 46    We disagree. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. When the parties present two credible but opposed versions of an event, and no extrinsic evidence is presented to corroborate or contradict either version, the case comes down to a credibility contest and can be

described as closely balanced. *Id.* ¶ 63. Defendant's premise that the conflicts in the evidence make this case close ignores both the totality of the evidence and common sense.

¶ 47 We must keep in mind that the parties' versions of the facts did not differ in most respects. Brouwer testified, and the squad-car video showed, that defendant took off running before Brouwer could ask him his name. Brouwer testified without contradiction that, as defendant ran, his left arm swung widely, but his right arm stayed curiously still with his hand tucked into his side.

¶ 48 Further, Brouwer testified that defendant was wearing a holster manufactured for a small firearm but altered to accommodate a larger one. Most important, both Brouwer and Remnes testified that, when defendant was lifted off the ground, a semiautomatic weapon (which fit the redesigned holster) was lying on the ground directly under where defendant had lain. Remnes specifically stated that the gun was under where defendant's torso area had been, which was consistent with defendant having it in the holster. Yet defendant incredibly testified that a gun fitting the modified holster on his waistband was coincidentally present in the exact spot where he fell. Defendant also denied knowledge of the holster but did not explain how it got tucked into his waistband.

¶ 49 Defendant's testimony suffered from further, if less conclusive, infirmities. He claimed somewhat implausibly not to understand what Brouwer meant when he said that the marijuana violation was purely civil, not criminal. He testified that he ran from Brouwer because he feared getting caught with the marijuana that was in his left pocket along with his identification, and that he threw away the marijuana as he was running. Yet, when Brouwer searched defendant, he found marijuana and identification in his left pocket. Also, when asked whether the gun was visible after Brouwer stood him up, he testified, "*He—we* noticed it when we started walking toward the

ambulance." (Emphasis added.) The choice of "He [Brouwer]" would have implied that, after Brouwer stood defendant up, only Brouwer learned of the existence of the gun. That would imply that defendant already knew of the gun—because he had possessed it. Defendant switched midsentence to "We" to suggest that the existence of the gun was a revelation to him as well.

¶ 50 There is no credibility contest "when one party's version of the events was either implausible or corroborated by other evidence." *People v. Olla*, 2018 IL App (2d) 160118, ¶ 35. That is the situation here. The evidence that defendant possessed the firearm was plentiful and persuasive, and his denials were no such thing.

¶ 51 Given the strength of the evidence that he possessed a firearm, and the undisputed fact that he committed the predicate offenses, there is no reasonable probability that a limiting instruction on the latter element would have changed the result of the trial. A limiting instruction would not have explained how a semiautomatic pistol turned up directly underneath where the fleeing defendant had fallen while wearing a holster accommodating a weapon of that size. Any suggestion that the jury was significantly influenced by the proof of the predicate offenses, one of which was unspecified and the other of which defendant committed more than a decade before the trial, does not hold up. Thus, we reject defendant's claim of ineffective assistance of counsel.

¶ 52                                  III. CONCLUSION

¶ 53 For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 54 Affirmed.